Gilda **STINSON** and Robert T. Stinson

v.

**VAN VALLEY DEVELOPMENT COR-PORATION, Richard Liddell, James L. Hutson, Miller & Schroeder Municipals, Inc., Laventhol & Horwath.**

**Civ. A. No. 87–7922.**

United States District Court, E.D. Pennsylvania.

May 19, 1989.

Mitchell A. Kramer and Larry M. Keller, Philadelphia, Pa., and Robert D. Greenbaum, for plaintiffs.

Douglas Eason, Fuller Tubb & Pomeroy, Oklahoma City, Ok., for Richard Liddell.

David Pittinsky and Lawrence Berger, Philadelphia, Pa., for Laventhol & Horwath.

Alexander Kerr, Hoyle, Morris & Kerr, Philadelphia, Pa., and W. Michael Drake, Judith A. Rogosheske and Rebecca E. Bender, Drake & Rogosheske, Minneapolis, Minn., pro hac vice, for Miller & Schroeder Municipals, Inc.

Stacey L. Schwartz and Philip L. Blackman, Philadelphia, Pa., and Loutitia Denison Eason, Lawrence Ellis & Harmon, Oklahoma City, Okl., pro hac vice, for James L. Hutson.

## MEMORANDUM AND ORDER

HANNUM, Senior District Judge.

Plaintiffs Gilda Stinson and Robert Stinson ("Stinsons") allege that they and the class they seek to represent were defrauded in their purchase of Copper Lake Manor revenue bonds. The Stinsons seek application of the fraud-on-the-undeveloped-market theory to show reliance under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),[1] and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5.[2] Before the Court are Rule 12 motions to dismiss[3] and the Stinsons' motion for class certification under Fed.R.Civ.P. 23(b)(3).

*Background*

Between May 1, 1985 and December 19, 1986, the Edmond Home Finance Authority sold approximately $8,435,000 of Series 1985 Retirement Center Revenue Bonds ("bonds"), to finance Copper Lake Manor, Inc.'s ("CLM") construction of a 110–unit retirement center ("project") in Edmond, Oklahoma. The project was to generate revenue to retire the bonds through unit rentals. Apparently, the bonds were sold in increments of $5,000 to both institutional

---

1. Section 10(b) provides:
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
 \* \* \* \* \* \*
 (b) [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

2. Rule 10b–5 provides:
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 in connection with the purchase or sale of any security."

3. Defendants Laventhol & Horwath, Miller & Schroeder, and James L. Hutson have filed motions seeking dismissal under Fed.R.Civ.P. 12(b)(6) on several grounds, including the inadequacy of the Stinsons' claims of reliance. Because the Court finds the issue of reliance dispositive, alternative challenges to the sufficiency of the Stinsons' claims are not addressed.

and private investors. Gilda Stinson purchased $5,000 on behalf of her son Robert Stinson—before either one had read the disclosure statements made in connection with the offering.

Defendant Richard Liddell was the president of CLM and the president of Van Valley Development Corp., project developer and co-defendant. The Stinsons have alleged that defendant James L. Hutson was Vice–President of CLM, but Mr. Hutson disputes the specifics of these allegations. Defendant Laventhol & Horwath, a certified public accounting firm, prepared the project's May 7, 1985 financial feasibility study, part of the offering prospectus's official statement. Finally, defendant Miller & Schroeder Municipals, Inc., a Minneapolis, Minnesota broker and dealer, served as the underwriter of the bonds.

This action was precipitated by the failure of the retirement center and the resultant default on the bonds. The alleged misstatements and omissions in the preliminary and official offering statements include: (1) failure to disclose the projects inadequate working capital, (2) false pledges by CLM to insure and market the project, (3) inaccurate forecasts of occupancy rates, (4) failure to properly disclose and analyze depressed economic conditions in Oklahoma, and (5) failure to properly analyze the impact of the 20% moderate income tenants requirement. *See* Complaint at 9–11.

*Dismissal under Rule 12(b)(6)*

The motions for dismissal must be denied unless it appears beyond doubt that the Stinsons can prove no set of facts in support of their claims which would entitle them to relief. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.

2d 90 (1974) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed. 2d 80 (1957)). The Court accepts the Stinsons' *factual* allegations as true and reasonable inferences will be drawn in support of their claims. *See D.P. Enterprises v. Bucks County Community College*, 725 F.2d 943, 944 (3d Cir.1984).

The defendants have challenged the sufficiency of the allegations of reliance, the link between the alleged fraud and the Stinsons' purchase of Copper Lake Manor Revenue Bonds. In *Sharp v. Coopers & Lybrand*, 649 F.2d 175 (3d Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982), the Third Circuit explained that reliance "is therefore one aspect of the ubiquitous requirement that losses be causally related to the defendant's wrongful acts." *Id.* at 186. The *Sharp* court noted the Second Circuit's use of the term "transaction causation" to distinguish reliance from the "loss causation" elements in rule 10b–5 actions. *Id.* at 186–87 n. 16 (quoting *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 380–81 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975)). The Court concludes that the Stinsons' claims will be dismissed pursuant to Rule 12(b)(6) because they cannot show transaction causation—that their decision to purchase the bonds either was or could have been altered by the alleged misstatements and omissions of the defendants.[4]

In their complaint, the Stinsons claim alternative theories of reliance:

"Plaintiffs and members of the class reasonably relied upon defendants' false and misleading statements and/or the integrity of the market for the Bonds, reasonably believed that the market price of the

---

**4.** In *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J. 1989), the court considered similar Rule 12 motions under Rule 56. Citing an affidavit submitted by the plaintiffs, the *Cammer* Court found a material factual issue on whether the market (19,000,000 shares of common stock traded on NASDAQ over-the-counter market) was efficient for purposes of fraud-on-the-market presumption under *Basic v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) and *Peil v. Speiser*, 806 F.2d 1154 (3d Cir.1986). The *Cammer* court provided an illuminating discussion of the suggestion that "[the] inclination of a court to examine, on a preliminary basis, the character of the market for a particular stock should depend in large part on the strength of the plaintiffs' *prima facie* showing that the market is efficient." *Cammer*, 711 F.Supp. at 1288. Given the lack of factual allegations supporting a prima facie case of an efficient and developed market for CLM bonds, this Court concludes that Rule 12 dismissal is appropriate.

Bonds was validly set, and that no unsuspecting fraud affected the price."

Complaint at ¶ 30. Because they did not read the offering statements before purchase and cannot show direct reliance, the Stinsons seek a rebuttable presumption under the fraud-on-the-market theory of "indirect actual reliance". *See Zlotnick v. Tie Communications*, 836 F.2d 818, 820 (3d Cir.1988) ("An investor relying on the integrity of a market price in fact relies on other investors to interpret the relevant data and arrive at a price which, at the time of the transaction, reflects the true worth of the company.").

### The Presumption of Reliance in Undeveloped Markets

In *Peil v. Speiser*, 806 F.2d 1154 (3d Cir.1986), the Third Circuit applied the fraud on the market presumption of reliance in a case where the plaintiffs characterized the securities as corporate stock that was "very heavily traded and ... a leading percentage gainer on the American Stock Exchange." *Id.* at 1158. The *Peil* Court noted that "[t]he fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *Id.* at 1160 (citing Note, *The Fraud-on-the-Market-Theory*, 95 Harv.L.Rev. 1142, 1154–56 (1982)). The court in *Cammer v. Bloom*, 711 F.Supp. 1264, 1276 & n. 17 (D.N.J. 1989), noting that *Peil* did not define "open and developed market," quoted commentators 4 Bromberg & Lowenfels, *Securities Fraud and Commodities Fraud*, § 8.6 (Aug.1988) ("Bromberg") for the following definitions:

—An open market is one in which anyone, or at least a large number of persons, can buy or sell.

—A developed market is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).

—An efficient market is one which rapidly reflects new information in price. These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.

*Cammer*, 711 F.Supp. at 1276 & n. 17 (quoting Bromberg).

In *Basic v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court, in a 4–2 decision, allowed application of the fraud-on-the-market presumption where the securities where traded on the New York Stock Exchange. *Id.* 108 S.Ct. at 988–89. *Basic* quoted *Peil* for the proposition that the fraud on the market theory presupposes an open and developed market. *Id.* (quoting *Peil*, 806 F.2d at 1160–61)). The *Basic* Court "adopted the lower court's holding that the plaintiff 'must allege and prove ... that the shares were traded on an efficient market,' before a trial court may invoke the presumption." *Cammer v. Bloom*, 711 F.Supp. 1264, 1290 (D.N.J. 1989) (quoting *Basic*, 108 S.Ct. at 992 n. 27).[5] Therefore, to apply the fraud-on-the-market theory trial courts must look for the kind of market efficiency shown by the open and developed markets found in

---

5. In a well-reasoned opinion, United States District Judge Alfred J. Lechner, Jr. concluded that *"Peil* and *Basic* unambiguously require a plaintiff to allege: '(3) that the shares were traded on an efficient market.'" *Cammer*, 711 F.Supp. at 1285 (quoting *Basic*, 108 S.Ct. at 992 n. 7). The *Cammer* court offered the following indicia of an efficient market: 1) sufficient weekly trading volume 2) reports and analysis by investment professionals 3) market makers and arbitrageurs 4) eligibility to file S–3 Registration Statement and 5) historical showing of immediate price response to unexpected events or financial releases). *Cammer*, 711 F.Supp. at 1274–75. In stark contrast to these kinds of factors, the Stinsons' strongest claims of an efficient market rest on their assertion that the bonds were sold throughout the United States in a diverse public market.

*Basic* and *Peil. See Cammer*, 711 F.Supp. at 1275–77 & 1285–87.

As the *Basic* Court explained, "[p]resumptions typically serve to assist courts in managing circumstances in which direct proof, for one reason or another, is rendered difficult." *Basic*, 108 S.Ct. at 990. The wisdom of applying a presumption of reliance to a particular rule 10b–5 case depends on whether "the presumption is ... supported by common sense and probability." *Id.* at 991. The Third Circuit's analysis in *Zlotnick* demonstrates that special circumstances must combine before it is "logical" to find that common sense and probability warrant presumed reliance:

> The fraud-on-the-market theory creates a threefold presumption of indirect reliance. First, this court presumes that the misrepresentation affected the market price. Second, it presumes that a purchaser did in fact rely on the price of the stock as indicative of its value. Third, it presumes the reasonableness of that reliance. All of these presumptions are necessary to establish actual reliance.

*Zlotnick*, 836 F.2d at 822.

In a particular case, the plausibility of both the second and third presumptions are undermined when the certitude of the first presumption, market integrity, is in doubt. Market integrity contemplates that market prices accurately reflect efficient dissemination and thoughtful analysis of available information. *See Peil*, 806 F.2d at 1161 n. 10 (theory assumes "a nearly perfect market in information, and that the market price of stock reacts to and reflects the available information"). *See generally In re LTV Securities Litigation*, 88 F.R.D. 134, 142–47 (N.D.Tex.1980). Of course, when materially misleading statements are introduced, the fraud-on-the-market is said to occur in that the misleading information is assimilated by market mechanisms, resulting in a distorted market price.[6]

The *Basic* majority (4–2) opined that courts and commentators have concluded that the presumption of this market integrity, and therewith investors' reliance, is justified where these fraudulent statements are disseminated into an impersonal, well-developed market. *Basic*, 108 S.Ct. at 991. *But see Basic*, 108 S.Ct. at 996 (White, J. dissenting) (majority fails to note that transactions often motivated by belief that market price inaccurately reflects value). Nevertheless, where the securities are not traded in an efficient market, common sense and probability resist the conclusion that market mechanisms rapidly assimilate available information. *See Basic*, 108 S.Ct. at 990–92; *Abell v. Potomac Insurance Co.*, 858 F.2d 1104, 1122 (5th Cir.1988) (decided after *Basic* ). In *Abell*, the Fifth Circuit provided persuasive "common sense" analysis against extending the theory to cases where there is no efficient secondary market:

> Moreover, we perceive strong policy reasons to reject the bondholders' contentions. The plaintiffs' position would attenuate the fraud-on-the-market presumption of reliance far beyond its proper bounds and almost entirely extinguish reliance as a legitimate element of a rule 10b–5 claim.
>
> . . . .
>
> Where, as here, investors seek out *underpriced* securities that are traded outside efficient secondary markets, the fraud-on-the-market theory of reliance no longer makes sense. Investors can no longer be said to have relied upon an established market price, which, if it exists at all, reflects an inherently unstable and probably inaccurate estimate of the security's actual value.

---

**6.** The Third Circuit, in *Zlotnick*, summarized the chain of reasoning underlying this theory of indirect actual reliance:

> [T]he market price of the stock is itself a representation on which a purchaser may rely. Because the market price has been infected by fraud, that price is—at least to the extent that it is artificially inflated—a misrepresentation. Though "the market" actually sets the improper price, the defendant has participated in the setting of the price by making false statements in order to affect that price. Thus, the purchaser has in fact relied on the false statements of the defendant, if indirectly.

*Zlotnick*, 836 F.2d at 822 (citations omitted).

*Id.* Embracing this analysis, this Court turns to the particular market for CLM bonds as revealed in the pleadings of the Stinsons.

The record shows that the Stinsons bought $5,000 worth of CLM revenue bonds of the initial offering of approximately $8.45 million. The complaint makes conclusory allegations of reliance on market integrity by implication:

> As a direct and proximate result of the foregoing [alleged fraud], plaintiffs and the members of the class have been damaged in a substantial but as yet undetermined amount. The misrepresentations and omissions as set forth in paragraphs 26(a) through 26(c) caused the damage to the plaintiffs as described herein. The investing public purchased the Bonds at prices that were based on the untrue and misleading statements and without the knowledge of the nondisclosure and misstatements. Additionally, plaintiffs and the members of the class have been damaged in that the Bonds are in default and they have not received interest payments thereon since before November 1986. Had the true facts been fully and timely disclosed, plaintiffs and members of the class would not have purchased the Bonds at all, or if purchased, would have purchased such Bonds at substantially lower prices.

Complaint at ¶ 31. The Stinsons urge that "[i]t stands to reason that the Copper Lake Manor Bonds, which were marketed throughout the United States to institutional and private investors alike, were sold in a diverse public market." Docket No. 51 at 11. While the Stinsons have not alleged that the CLM bond market enjoyed the degree of openness involved in issues traded on a public exchange, for purposes of this determination the Court credits the Stinsons' claims that the bonds were publicly marketed throughout the United States. Thus, a large number of people could buy, if not sell, CLM bonds.

Next, the Court looks for factual allegations that the bonds were traded in a developed market—a secondary market with a relatively high level of trading activity and for which trading information such as price and volume were readily available. The Stinsons have acknowledged that this case involves a new issue, *see* Docket No. 51 at 11, and have not alleged the existence this kind of developed secondary market. Clearly, the Stinsons have not made a prima facie case of a developed market and, as noted in *Cammer*, " 'an efficient market will almost invariably be a developed one.' " *See Cammer*, 711 F.Supp. at 1276 n. 17 (quoting Bromberg, § 8.6).

■ In sum, the Stinsons' claims that the bonds were publicly offered throughout the United States in a diverse market are insufficient to show the sort of open and developed market warranting application of the fraud on the market theory. The "common sense and probability" which the *Basic* majority found attended the presumption in the case of developed liquid securities markets cannot be found in this case. In *Peil*, the Third Circuit acknowledged the potential force of this argument, stating that "[w]hile this presumption is plausible in developed markets, it may not be in the case of a newly issued stock." *Peil*, 806 F.2d at 1161 n. 10.

Finally, the Stinsons have suggested that they have adequately pleaded facts that entitle them to proceed under a fraud-created-the-market version [7] of the theory:

> Plaintiffs have alleged that defendants, "the Copper Lake Manor promoters", failed to disclose that the project was inadequately financed and did not have the financial ability to provide adequate working capital. Plaintiffs' Complaint at paragraph 26(b). This allegation sets out that defendants were aware of the financial non-viability, i.e., worthlessness of Copper Lake Manor.

Docket No. 51 at 9–10. Despite this conclusory characterization of their factual al-

---

7. In *Shores v. Sklar*, 647 F.2d 462 (5th Cir.1981) (en banc), *cert. denied*, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983), the Fifth Circuit ruled that "[t]he securities laws allow an inves- tor to rely on the integrity of the market to the extent that the security it offers ... for purchase are entitled to be in the market place." *Id.* at 471.

legations, the Stinsons have not alleged the kind of fraud that would justify proceeding on the theory that the bonds were not entitled to be marketed. As the *Abell* court explained, for purpose of the fraud-created-the-market presumption, securities are unmarketable "only where the promoters knew the enterprise itself was patently worthless." *Abell*, 858 F.2d at 1122. The *Abell* court made clear that the fraud-created-the-market theory could be appropriately applied only in a case of theft or hoax—where the promoters relied on a sham business and did not intend to start a legitimate one. *Id.* at 1121-23 (theory applicable only "where the promoters knew that the subject enterprise was worthless when the securities were issued, and successfully issued the securities only because of defendants' fraudulent scheme"). Thus, even if the Stinsons' allegations of fraud and an inadequately financed project are proven, this showing would not demonstrate that the project was the kind of sham or hoax warranting application of the fraud-created-the-market presumption.

■ Summarizing this Court's determinations, focusing on the common sense and probability, this Court is unwilling to presume that the Stinsons reasonably relied on market integrity. *Basic*, 108 S.Ct. at 990-92; *Abell*, 858 F.2d at 1122. Moreover, given that there has been no tenable suggestion that the bonds were worthless when issued and successfully issued only because of the alleged fraudulent scheme, the fraud-created-the-market theory is not applicable. *Id.* at 1122-23. In view of these conclusions, the Stinsons cannot maintain an action under rule 10b-5 because they cannot show reliance. *See Basic*, 108 S.Ct. at 989 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206, 96 S.Ct. 1375, 1387, 47 L.Ed.2d 668 (1976)). Thus, Count I of the complaint will be dismissed with prejudice.

*Derivative and Pendent Claims*

Counts II and III of the Stinsons complaint incorporate by reference the rule 10b-5 claims of Count I and seek remedy based on derivative liability under Count I. Count II alleges that defendants Liddell and Hutson are secondarily liable as controlling persons under section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t. *See Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 889 (3d Cir.1975) (provision imposes secondary liability on one who controls violator of securities laws and did not act in good faith). Count III alleges that Van Valley Development Corp. is liable for the actions of Liddell under a theory of *respondeat superior*. Because the Court has concluded that Count I must be dismissed, the derivative claims of Counts II and III are no longer tenable and will be dismissed with prejudice.

Counts IV (fraud and deceit) and V (negligent misrepresentation) are pendent claims based on state law. Given the absence of a substantial federal claim at this early stage, the Court will not exercise jurisdiction over these state claims. *See Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 196 (3d Cir.1976). Thus, Counts IV and V will be dismissed without prejudice.[8]

An Order reflecting this disposition follows.

### ORDER

AND NOW, this 19th day of May, 1989, upon consideration of Motion of Defendant Miller & Schroeder Municipals, Inc. to Dismiss Plaintiffs' Complaint (Docket Entry No. 5), Defendant Laventhol & Horwath's Motion to Dismiss the Complaint (Docket Entry No. 6), Plaintiffs' Motion for Class Action Certification (Docket Entry No. 11), Plaintiffs' Response to Defendants Miller & Schroeder Municipals, Inc. and Laventhol and Horwath's Motions to Dismiss the Complaint (Docket Entry No. 15), Defendant James L. Hutson's Motion to Dismiss, or in the Alternative to Transfer to the Western District of Oklahoma (Docket Entry No. 19), Defendant Laventhol & Hor-

---

**8.** Since the named plaintiffs claims have been dismissed, the Stinsons' motion for class certification is moot. *See* Fed.R.Civ.P. 23.

wath's Memorandum of Law in Opposition to Defendant James L. Hutson's Motion in the Alternative to Transfer to the Western District of Oklahoma (Docket Entry No. 24), Defendant Miller & Schroeder Municipals, Inc. Memorandum in Opposition to Defendant Hutson's Motion to Transfer to the Western District of Oklahoma (Docket Entry No. 25), Plaintiffs' Memorandum of Law in Opposition to Defendant James L. Hutson's Motion to Dismiss, or in the Alternative Motion to Transfer to the Western District of Oklahoma (Docket Entry No. 26), Defendant James L. Hutson's Reply to Plaintiffs' Response and the Responses of Defendants Miller and Schroeder Municipals and Laventhol and Horwath to Defendant Hutson's Motion to Dismiss, or in the Alternative Transfer to the Western District of Oklahoma (Docket Entry No. 27), Supplemental Memorandum in Support of Motion of Defendant Miller & Schroeder Municipals, Inc. to Dismiss Plaintiffs' Complaint (Docket Entry No. 30), Plaintiffs' Supplemental Memorandum of Law in Opposition to James L. Hutson's Motion to Dismiss, or in the Alternative Motion to Transfer to the Western District of Oklahoma (Docket Entry No. 31), Plaintiffs' Supplemental Memorandum in Opposition to Motion of Defendant Miller & Schroeder Municipals, Inc. to Dismiss Plaintiffs' Complaint (Docket Entry No. 32), Laventhol & Horwath's Memorandum of Law in Opposition to Plaintiffs' Motion for Class Action Certification (Docket Entry No. 36), Defendant Miller & Schroeder Municipals, Inc.'s Memorandum in Opposition to Plaintiffs' Motion for Class Certification (Docket Entry No. 37), Defendant James L. Hutson's Memorandum of Law in Opposition to Plaintiffs' Gilda Stinson's and Robert Stinson's Motion for Class Action Certification (Docket Entry No. 38), Plaintiffs' Responding Memorandum of Law to Defendants' Opposition to Class Certification (Docket Entry No. 42), Plaintiffs' Supplemental Memorandum of Law in Support of their Motion for Class Certification and in Opposition to Defendants' Motions to Dismiss the Complaint (Docket Entry No. 51), Memorandum of Law of Defendant Laventhol & Horwath in Response to Plain-

tiffs' Supplemental Memorandum (Docket Entry No. 52), and Plaintiffs' Memorandum of Law in Reply to Defendant Laventhol & Horwath's Response to Plaintiffs' Supplemental Memorandum of Law (Docket Entry No. 55), it is hereby ORDERED that

(1) Count I, Count II and Count III are DISMISSED with prejudice pursuant to Fed.R.Civ.P. 12(b)(6).

(2) Counts IV and V are DISMISSED without prejudice.

(3) Plaintiffs' motion for class certification is DENIED as moot.