**Gilda STINSON and Robert T. Stinson**

v.

**VAN VALLEY DEVELOPMENT CORPORATION, Richard Liddell, James L. Hutson, Miller & Schroeder Municipals, Inc., Laventhol & Horwath.**

Civ. A. No. 87–7922.

United States District Court,
E.D. Pennsylvania.

Aug. 10, 1989.

Mitchell A. Kramer and Larry M. Keller, Philadelphia, Pa., and Robert D. Greenbaum, for plaintiffs.

Douglas Eason, Fuller Tubb & Pomeroy, Oklahoma City, Okl., for Richard Liddell.

Alexander Kerr, Hoyle, Morris & Kerr, Philadelphia, Pa., for Miller & Schroeder Municipals, Inc.

David Pittinsky and Lawrence Berger, Philadelphia, Pa., for Laventhol & Horwath.

W. Michael Drake, Judith A. Rogosheske and Rebecca E. Bender, Drake & Rogosheske, Minneapolis, Minn., pro hac Vice, for Miller & Schroeder Municipals, Inc.

Stacey L. Schwartz and Philip L. Blackman, Philadelphia, Pa., pro hac vice, and Loutitia Denison Eason, Lawrence Ellis & Harmon, Oklahoma City, Okl., for James L. Hutson.

## MEMORANDUM AND ORDER

HANNUM, Senior District Judge.

The issue is whether a fraud-created-the-market presumption of reliance is available to the plaintiffs, Gilda Stinson and Robert Stinson ("Stinsons"). The Stinsons allege that they and the class they seek to represent were defrauded in their purchase of Copper Lake Manor revenue bonds.[1] In

---

1. As reported in this Court's May 19, 1989 Memorandum and Order:

    Between May 1, 1985 and December 19, 1986, the Edmund Home Finance Authority

sold approximately $8,435,000 of Series 1985 Retirement Center Revenue Bonds ("bonds"), to finance Copper Lake Manor, Inc.'s ("CLM") construction of a 110-unit retirement center

response to the Court's May 19, 1989 Memorandum and Order, which, *inter alia*, dismissed their complaint for failure to adequately allege reliance under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5, the Stinsons seek leave to file an Amended Complaint proceeding under a fraud-created-the-market presumption of reliance. The defendants oppose the plaintiffs' request for leave to file an Amended Complaint—primarily on grounds that the proposed amendment could not withstand a motion to dismiss.

The defendants have made no special showing of prejudice or undue delay, thus the controlling issue under Fed.R.Civ.P. 15 is whether the proposed amendment would be futile. While Rule 15 embodies a liberal amendment philosophy, case law confirms that leave to amend can properly be denied where the proposed amendment cannot survive a motion to dismiss. *See Massarsky v. General Motors Corp.*, 706 F.2d 111 (3d Cir.1983) (proposed post-judgment addition of state law claim futile where jury response to interrogatories precluded recovery); *Jablonski v. Pan American World Airways, Inc.*, 863 F.2d 289 (3d Cir.1988) (request to add time-barred claim denied); *Michener v. Lower Providence Township*, Nos. 87–5709, 87–6419, and 88–1242, slip op. (E.D.Pa.1989) (1989 W.L. 51486) (failure to allege a pattern in RICO case warranted denial of leave to amend complaint); *Snyder v. Baumecker*, 708 F.Supp. 1451 (D.N.J.1989) (leave to amend denied where no standing for injunctive relief sought). In

this determination, the proposed amendment is viewed in a light most favorable to the pleader and " 'it should not be rejected unless it appears to a certainty that the pleader would not be entitled to any relief under it.' " *Michener*, W.L. at 3 (quoting *Cooper v. American Employers' Insurance Co.*, 296 F.2d 303, 307 (6th Cir.1961)). As defendants note, the Stinsons' request should be denied on either of two grounds: 1) if a fraud-created-the-market presumption is not viable in this Circuit or 2) if at this preliminary stage it is clear that the proposed Amended Complaint cannot show reliance under such a theory.

## THE AVAILABILITY OF A FRAUD–CREATED–THE–MARKET–PRESUMPTION

The Third Circuit embraced the fraud-on-the-market theory in *Peil v. Speiser*, 806 F.2d 1154 (3d Cir.1986).[2] In *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) the Supreme Court quoted *Peil* in its approval of application of a rebuttable presumption of reliance where the securities were traded on an open and developed market. *Basic*, 108 S.Ct. at 990 (quoting *Peil*, 806 F.2d at 1160–61). Based on *Peil* and *Basic*, the threshold requirement for application of this presumption is a showing of an open and developed securities market.[3] *See Stinson v. Van Valley Development*, 714 F.Supp. 132, 135 & n. 5 (E.D.Pa.1989) (quoting *Cammer v. Bloom*, 711 F.Supp. 1264, 1285, 1290 (D.N.J.1989)). The cases binding this Court reflect this requirement, applying the fraud-on-the-market presumption where common stock has been traded on highly liquid public

("project") in Edmond, Oklahoma. The project was to generate revenue to retire the bonds through unit rentals. Apparently, the bonds were sold in increments of $5,000 to both institutional and private investors. Gilda Stinson purchased $5,000 on behalf of her son Robert Stinson—before either one had read the disclosure statements made in connection with the offering. *Stinson v. Van Valley Development Corp.*, 714 F.Supp. 132, 133–34 (E.D.Pa.1989).

**2.** In *Zlotnick v. TIE Communications*, 836 F.2d 818 (3d Cir.1988), the Third Circuit explained the mechanics of this presumption:

An investor relying on the integrity of a market price in fact relies on other investors to

interpret the relevant data and arrive at a price which, at the time of the transaction, reflects the true worth of the company. *Id.* at 820.

**3.** In *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J. 1989), the court offered the following indicia of market efficiency sufficient to satisfy this threshold: 1) sufficient weekly trading volume, 2) reports and analysis by investment professionals, 3) market makers and arbitragers, 4) eligibility to file S–3 Registration Statement, and 5) historical showing of immediate price response to unexpected events or financial releases. *Id.* at 1274–75.

exchanges. *See, e.g., Basic* (New York Stock Exchange); *Peil* (stock "very heavily traded and ... a leading percentage gainer on the American Stock Exchange"). *Cf. Cammer* (presumption available only when efficient market shown for specific NASDQ over-the-counter stock).

Although numerous courts have extended the fraud-on-the-market theory to allow a fraud-created-the-market presumption in cases of newly issued securities or securities traded in inefficient markets, *see In re Bexar County Health Facility Development Corp. Securities Litigation,* 125 F.R.D. 625, 631–32 (E.D.Pa.1989), the viability of the presumption in such cases remains unclear.[4] Not surprisingly, the defendants urge this court to decline to recognize a fraud-created-the-market presumption of reliance. While courts in the Eastern District have diverged on the availability of this presumption, *compare Bexar* (class certified where potential availability of fraud-created-the-market presumption satisfied typicality requirement) *with Desfor v. National Housing Ministries,* No. 84–1562, slip op. (E.D.Pa. Oct. 22, 1986) (1986 WL 12031) (Rule 12(b)(6) dismissal where application of fraud-created-the-market presumption declined), the Third Circuit has not yet determined the vitality of this presumption. *See Peil v. Speiser,* 806 F.2d 1154, 1161 & n. 10 (3d Cir.1986) ("While this presumption is plausible in developed markets, it may not be in the case of a newly issued stock."). Although *Bexar* and *Desfor* are helpful, neither provides persuasive reasoning in determining the case at bar.

In *Desfor,* Judge James T. Giles analyzed the fraud-created-the-market theory in the context of a motion to dismiss. The *Desfor* court found strong policy reasons for declining to accept the theory:

> The essence of this theory is that, but for the alleged omissions and/or misrepresentations, the bonds would never have been issued and, therefore, would have been unmarketable. This theory is not acceptable under the precedent in this circuit. *See Sharp* [*v. Coopers & Lybrand*], 649 F.2d [175] at 186 [(3d Cir. 1981)]. It stretches the fraud-on-the-market theory beyond the contemplation of the securities laws. Here, there would be no direct proof of reliance whatsoever since a third party ultimately made the independent decision to utilize C & L's [Coopers & Lybrand] materials. The chain of causation is not capable of proof. Once the chain of causation becomes so attenuated, the securities laws no longer serve to protect the innocent investor without risk of injury to innocent third persons.

*Id.* However, *Desfor* was decided before the Third Circuit's decision in *Peil* and before the United States Supreme Court's decision in *Basic.* So, although the con-

---

**4.** The Supreme Court has not directly approved of a fraud-created-the-market version of the fraud-on-the-market presumption. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (presumption available where securities traded on well-developed market). However, the *Basic* Court, in a 4–2 opinion, established common sense and probability as the touchstones for granting a presumption of reliance in a particular case. 108 S.Ct. at 991. *But see Cammer,* 711 F.Supp. 1264, 1285 (D.N.J.1989) (*Peil* and *Basic* unambiguously require pleading an efficient market). Noting that Chief Justice Rehnquist and Justices Scalia and Kennedy did not participate in *Basic,* the defendant Laventhol & Horwath urge that "[a] District Court should not *expand* a Supreme Court opinion adopted by such a narrow and ephemeral majority, without further guidance from the Supreme Court itself." Docket No. 64 at n. 15.

To date, Circuit Courts have proven reluctant to embrace broad application of a fraud-created-the-market presumption. *See Abell v. Potomac Insurance Co.,* 858 F.2d 1104 (5th Cir.1988) (narrow reading of seminal case *Shores v. Sklar,* 647 F.2d 462 (5th Cir.1981) (*en banc*), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983)). *But see T.J. Raney & Sons, Inc. v. Fort Cobb,* 717 F.2d 1330 (10th Cir.1983) (adopting *Shores*), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984). The Eleventh Circuit vacated *Ross v. Bank South,* 837 F.2d 980 (11th Cir.1988), a panel decision allowing application of the presumption under *Shores. See* 848 F.2d 1132 (11th Cir.1988) (*en banc*) (rehearing *en banc* October 1988 and opinion pending). Therefore, while *Basic* can be read to allow Circuit Court development of a fraud-created-the-market presumption where supported by common sense and probability, it remains unclear whether and under what circumstances Circuit Courts will permit this development.

cerns raised in *Desfor* remain important, subsequent case law has shown countervailing grounds for allowing application of this presumption in limited circumstances. *See Abell v. Potomac Insurance Co.*, 858 F.2d 1104 (5th Cir.1988).

In the recent *Bexar* case, Judge Louis C. Bechtle considered the development of the fraud-created-the-market theory in the context of a motion for class certification. The *Bexar* court concluded that the presumption was available[5] and that the typicality requirement of Fed.R.Civ.P. 23 was met where:

> count II of plaintiff's complaint alleges that defendants conspired to bring the Trinity [mortgage revenue] bonds onto the market through a series of fraudulent misrepresentations and material omissions in that the bonds could not have been marketed had the true financial status of the Canyon Creek and Rolling Meadows facilities been disclosed.

*Bexar*, 125 F.R.D. at 631. While noting that numerous courts had extended the rationale of *Peil* and *Basic* to establish a fraud-created-the-market presumption, the *Bexar* court also noted adverse case authority, including *Abell* and *Desfor*. *Id.* at 631–32. The *Bexar* court then explained at least one reason for declining to follow the narrow approach of *Abell:*

> Defendants note that in *Abell, supra,* 858 F.2d 1104, the Fifth Circuit took a narrow view of its prior decision in *Shores v. Sklar* and limited the fraud created the market presumption to instances where "the promoters knew the enterprise itself was patently worthless." *Id.* at 1122. The court in *Abell,* however, was addressing this issue with the benefit of a complete factual record [partial judgement notwithstanding the verdict

after jury trial]. To do so here would certainly violate the admonition that courts should not delve excessively into the merits when determining whether class certification is appropriate. *Eisen [v. Carlisle and Jacquelin ], supra,* 417 U.S. [156] at 177–78 [94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974) ].

*Bexar*, 125 F.R.D. at 632 (footnote omitted). Given the constrained context[6] within which the *Bexar* court operated, it is clear that *Bexar* does not represent a final statement on the appropriate application of the fraud-created-the-market presumption.

As this Court suggested in its May 19, 1989 Memorandum and Order, in determining the availability of a presumption of reliance, the extent of a preliminary inquiry into the character of the market for a particular stock must depend on the plaintiff's prima facie showing. *See Stinson v. Van Valley Development Corp.,* 714 F.Supp. 132, 134 n. 4 (E.D.Pa.1989) (quoting *Cammer v. Bloom,* 711 F.Supp. 1264, 1288 (D.N.J.1989)). Under the guidance of *Basic,* the touchstones for application of a presumption of reliance are common sense and probability. *Basic,* 108 S.Ct. at 991. *See also Stinson,* 714 F.Supp. at 136. Where, as here, the Court can conclude from plaintiff's prima facie case that probability and common sense do not warrant application of a presumption, dismissal at this preliminary stage is warranted.

As noted in the May 19, 1989 memorandum opinion, this Court finds *Abell* to be a helpful guide in determining where common sense and probability support application of a fraud-created-the-market presumption. While investors cannot be said to reasonably rely on market mechanism to reflect an accurate price in illiquid and undeveloped markets,[7] reliance on market in-

---

5. The *Bexar* court was careful in explaining that its holding is "a narrow one ... that the allegations of fraud set forth in plaintiff's complaint are sufficient to invoke the fraud created the market presumption of reliance for purposes of class certification under Rule 10b–5(1) or (3)." *Bexar*, 125 F.R.D. at 632 (relying on *Shores v. Sklar,* 647 F.2d 462 (5th Cir.1981) (*en banc*), *cert. denied* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983)).

6. This Court denied plaintiff's motion for class certification as moot upon concluding that dismissal was warranted for, *inter alia,* failure to adequately plead reliance. *See Stinson,* 714 F.Supp. at 138 n. 8.

7. As the *Abell* court explained:

> Where, as here, investors seek out *under-priced* securities that are traded outside efficient secondary markets, the fraud-on-the-

tegrity to reflect the basic marketability of a security is not so unlikely. This Court concludes that the rationale of *Peil* and *Basic* can properly be extended "where the promoters knew that the subject enterprise was worthless when the securities were issued, and successfully issued the securities only because of defendants' fraudulent scheme." *Abell*, 858 F.2d at 1122–23. In such cases, it is reasonable to presume that an investor would actually rely on the integrity of an illiquid market to reflect such a fundamental characteristic. In sum, this Court finds *Abell* persuasive and adopts the narrow standard of a rebuttable fraud-created-the-market presumption endorsed by the *Abell* court. *See id.* at 1122 ("[S]ecurities meet the test of 'not entitled to be marketed' only where the promoters knew the enterprise itself was patently worthless.").

## THE AMENDED COMPLAINT & THE FRAUD–CREATED–THE–MARKET PRESUMPTION

This Court determined that the Stinsons' Complaint—which focused on the failure to disclose the inadequate financing of the Copper Lake Manor Project—could not proceed under the narrow *Abell* fraud-created-the-market standard. *See Stinson*, 714 F.Supp. at 138 ("[G]iven that there has been no tenable suggestion that the bonds were worthless when issued and successfully issued only because of the alleged fraudulent scheme, the fraud-created-the-market theory is not applicable."). Thus, the question is whether the Stinsons proposed Amended Complaint alleges adequate *facts* justifying further proceeding under this theory. The Court notes that the focus of its inquiry is the value of the

bonds at the time of issuance—whether the promoters knew that the development project pledged to retire the bonds was patently worthless, a sham or hoax. Under the *Abell* standard, even where a project was misconceived and badly managed, this alone does not amount to the kind of unmarketability warranting application of the fraud-created-the-market presumption.

The new allegations by the Stinsons involve the defendants' misrepresentations and failure to disclose material facts regarding the Copper Lake Manor Project. These alleged omissions and misrepresentations include the failure to disclose: 1) the use of a contractor controlled by defendant Richard Liddell, and his family, and with which Copper Lake Manor, Inc. had no contract (instead of an independent contractor bound by a stipulated sum contract); 2) the use of bond proceeds for construction of Copper Lake rather than exclusively for project construction; 3) that the CLM partnership controlled by defendants James Hutson and Richard Lidell would conduct business related to the project; and 4) that defendants Miller & Schroeder and Laventhol & Horwath failed to conduct due diligence investigations of the construction or operation of the project. *See* Docket No. 59 at 4. These allegations are similar to the Stinsons's initial charges—focusing on the alleged financial mismanagement in the planning and development of the project.[8] Without gainsaying the seriousness of such allegations, they fail to show the kind of sham or hoax required under the *Abell* standard.

As defendants have noted, there has been no showing that the bonds or the underlying retirement center project was or is now worthless.[9] While the Stinsons's

market theory of reliance no longer makes sense. Investors can no longer be said to have relied upon an established market price, which, if it exists at all, reflects an inherently unstable and probably inaccurate estimate of the security's actual value.
*Abell*, 858 F.2d at 1122.

**8.** As this Court has prior noted, "[t]he alleged misstatements and omissions in the preliminary and official offering statements include: (1) failure to disclose the project's inadequate working capital, (2) false pledges by CLM to insure and

market the project, (3) inaccurate forecasts of occupancy rates, (4) failure to properly disclose and analyze depressed economic conditions in Oklahoma, and (5) failure to properly analyze the impact of the 20% moderate income tenants requirement." *Stinson*, 714 F.Supp. at 134.

**9.** In September of 1988, the Trustee reported that:

The Trustee and Bondholder Committee have hired a prominent MAI appraiser, who advises that the property is worth from $3,200,000

allegations may be taken to suggest serious mismanagement and undisclosed self-dealing, they have not shown that the Copper Lake Project was patently worthless. The record shows that the planned retirement center was genuine. It was built and occupied—although obviously not at rates sufficient to retire the bonds. So, despite the fact that the bonds have been in default, it is *conceivable* that under improved economic fortunes in Oklahoma the project could have succeeded and the bonds successfully retired.[10]

Upon review of the Stinson's allegations, it is clear that this case does not involve unmarketable "worthless" bonds under the *Abell* standard. The Court concludes that the Stinsons allegations of fraud go to whether the bonds were offered at a fair value rather than to whether the bonds were marketable under *Abell.* Accordingly, their motion for leave to file an Amended Complaint will be denied.

An appropriate Order follows.

## ORDER

AND NOW, this 10th day of August, 1989, upon consideration of Plaintiffs' Motion for Leave to Amend Their Complaint and for Reconsideration of the Order Dismissing Plaintiffs' Complaint with Prejudice, Made Pursuant to Fed.R.Civ.P. 15(a), 59(e), and Local Rule of the District Court for the Eastern District of Pennsylvania 20(g) (Docket No. 59), Defendant James L. Hutson's Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to Amend Their Complaint and for Reconsideration of the Order Dismissing Plaintiffs' Complaint with Prejudice (Docket No. 60), Memorandum of Defendant Miller & Schroeder Municipals, Inc. in Opposition to Plaintiffs' Motion for Reconsideration of the Order Dismissing Plaintiffs' Complaint with Prejudice and for Leave to File an Amended Complaint (Docket No. 61), Memorandum of Law of Defendant Laventhol & Horwath in Opposition to Plaintiffs' Motion for Leave to Amend Their Complaint and for Reconsideration of the Order Dismissing their Complaint with Prejudice (Docket No. 64), Defendant James L. Hutson's Supplemental Memorandum of Law (Docket No. 65), and Plaintiffs' Consolidated Reply to Defendants' Memoranda of Law in Opposition to Plaintiffs' Motion for Leave to Amend their Complaint and for Reconsideration of the Order Dismissing Plaintiffs' Complaint with Prejudice (Docket No. 66), it is hereby ORDERED that plaintiffs' Motion for Leave to Amend Their Complaint and for Reconsideration of the Order Dismissing Plaintiffs' Complaint with Prejudice, Made Pursuant to Fed.R.Civ.P. 15(a), 59(e), and Local Rule of the District Court for the Eastern District of Pennsylvania 20(g) is DENIED.

---

to $4,000,000, depending upon the method of sale. The Company has hired its own MAI appraiser, who has appraised the property as worth approximately $1,770,000 to $3,900,000, again, depending upon the method of sale. *See* Docket No. 66, Exhibit A at 3. Although the *Abell* court noted that "saleable assets bless even the most worthless enterprise," *see* 858 F.2d at 1122, the Court finds these appraisals a further indication that the underlying project was not a worthless sham.

**10.** In a September 7, 1988 letter the Bond Trustee, American National Bank and Trust Company of Shawnee reported to bondholders that "[t]he probability of the Company correcting the default by paying its contracted debt is exceedingly small." Docket No. 66, Exhibit A.