**In re BEXAR COUNTY HEALTH FACILITY DEVELOPMENT CORPORATION SECURITIES LITIGATION.**

**MDL No. 768.**

United States District Court, E.D. Pennsylvania.

April 10, 1990.

Bruce K. Cohen, Meredith & Cohen, P.C., Philadelphia, Pa.

Edward F. Haber, Shapiro Grace & Haber, Boston, Mass.

Robert C. Schubert, San Francisco, Cal.

W. Michael Drake, Drake & Rogosheske, Minneapolis, Minn.

Janet Stern Holcombe, Mann & Ungar, P.A., Philadelphia, Pa.

Alexander Kerr, Hoyle, Morris & Kerr, Philadelphia, Pa.

John J. Soroko, Duane, Morris & Heckscher, Philadelphia, Pa.

Nicholas E. Chimicles, Denise D. Schwartzman, Haverford, Pa.

Edward R. Finck, Jr., San Antonio, Tex.

Mark S. Halpern, Philadelphia, Pa.

William A. Moore, Sioux Falls, S.D.

W. Michael Drake, Carol I. Spresser, Minneapolis, Minn.

Monte R. Walz, Sioux Falls, S.D.

Eric J. Mayer, Houston, Tex.

Thomas R. Todd, Jr., Atlanta, Ga., for Americare Corp., Americare Management Corp., Jim McCarver.

## MEMORANDUM AND ORDER

BECHTLE, Chief Judge.

Presently before the court are defendants' motions for reconsideration of the court's prior order granting in part plaintiffs' motion for class certification, and defendants' motion to dismiss plaintiffs' complaint. For the reasons set forth herein, defendants' motions will be granted.

## I. BACKGROUND

In *In re Bexar County Health Facility Development Corporation Securities Litigation,* 125 F.R.D. 625 (E.D.Pa.1989) (*"Bexar I"*) this court granted plaintiffs' motion for class certification solely on the issue of whether an official statement offering revenue bonds to the public violated § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j, and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.[1] The court defined the class as:

All persons who were original purchasers of the Bexar County Health Facilities Development Corporation First Mortgage Revenue Bonds (Trinity Retirement Living Foundation Project) Series 1984, excluding only the defendants.

The terms of the financing are set forth in that Memorandum and Order and need not bear repeating except for one relevant correction discussed below.

The gravamen of plaintiffs' complaint alleges that purchasers of the Trinity revenue bonds were defrauded because a financial feasibility study prepared by the accounting firm of Laventhol & Horwath and included in the offering statement did not disclose the failure of two prior bond offerings which financed similar health care facilities. AmeriCare Corporation was the developer on all three projects and Laventhol & Horwath had prepared a feasibility study for one of the prior offerings. However, in the prior Memorandum, the court mistakenly identified Miller & Schroeder, Inc. as the primary underwriter and Kutak, Rock & Campbell as bond counsel on all three financings. The parties agree that this was incorrect. In fact, the involvement of Miller & Schroeder and Kutak, Rock & Campbell was limited to the Trinity project.

Based on this correction of fact, defendant Kutak, Rock & Campbell moves the court to reconsider its order denying without prejudice their motion to dismiss plaintiffs' claim alleging aider and abettor liability. Furthermore, all defendants seek reconsideration of the court's class certification order, or, in the alternative, redefinition of the class. Finally, all defendants seek reconsideration of the court's order denying their motion to dismiss plaintiff's complaint as untimely.

## II. DISCUSSION

The issues on reconsideration of the court's order granting class certification are the application of the "fraud-created-the-market" doctrine to newly issued municipal revenue bonds and the taxonomy of reliance in Rule 10b–5 cases involving both misrepresentations and omissions. The prior Memorandum attempted to confine the inquiry to traditional class action analysis, but recent legal developments in the securities field have persuaded the court to revisit these troublesome questions.

---

1. In the same Memorandum and Order the court denied plaintiffs' motion for class certification under §§ 12(2) and 17 of the Securities Act of 1933, 15 U.S.C. §§ 77l and 77q, various state blue sky laws, and state common law claims of fraud and misrepresentation.

### 1. Fraud on the Market

■ In order to establish a prima facie case of securities fraud under Rule 10b–5 a plaintiff must plead and prove (1) a misstatement or omission (2) of material fact (3) made with scienter (4) on which plaintiff reasonably relied, and (5) which was the proximate cause of an economic loss. *Peil v. Speiser*, 806 F.2d 1154, 1160 (3d Cir. 1986). Reliance has steadfastly remained an essential element of a Rule 10b–5 case. *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988), *citing, Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). However, the impracticability of proving direct reliance in modern securities transactions has spawned certain doctrines which dispense with its harsh requirement. Instead, courts have focused on the causation aspect of reliance to ensure that liberalization does not lead to the severing of the causal chain between a defendant's alleged fraud and a plaintiff's subsequent loss. The evolution of these theories is, if nothing else, a testament to the ingenuity of the common law.

The problem begins when the representative class plaintiffs, such as the four presented in this case, fail to read the document which contained the alleged fraud, thereby negating any claim of actual reliance on the misrepresentation or omission.[2] A plaintiff's inevitable response is that he relied on some mechanism, usually the "market", which absorbed and incorporated the fraudulent information into the price of the security-be it trading value of a stock, the yield and redemption provisions of a bond or other terms and conditions of an investment. This situation is described as a "fraud-on-the-market", as opposed to the individual investor.

The Supreme Court first relaxed the burden of proof on reliance in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). In *Affiliated Ute*, the Ute Indian tribe formed the Ute Development Corporation (UDC) to manage a trust composed of tribal assets which was created pursuant to the termination of federal supervision over the Ute reservation. Transfer of UDC shares issued to mixed-bloods was restricted, with tribal members receiving a right of first refusal. In addition, UDC shares could not be sold to nonmembers at a price lower than that offered to members of the tribe. The complaint alleged that two white employees of a bank, acting as stock transfer agent, defrauded the mixed-bloods by purchasing shares and arranging sales to other whites at prices substantially below the actual $1,500 per share value, while assuring the members that they were receiving fair consideration.

The Supreme Court found that the Ute's complaint stated a violation of Rule 10b–5 despite the lack of affirmative proof of plaintiffs' reliance on the defendants fraudulent representations as to the stock's value. In language which became the linchpin in the moderation of the reliance requirement, Justice Blackmun wrote that:

> Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision … This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

**2.** In a recent submission to the court, defendants have outlined the testimony of the four class plaintiffs on this issue. Plaintiffs Edward J. Whalen, Edward P. Fahey and William J. Rohleder each testified in deposition that they purchased their Trinity bonds on the advice of their broker and did not receive the Offering Statement until after their purchase. Plaintiff Whalen also testified that he relied on a one-page flier from his broker which briefly summarized information in the Official Statement. Fi-

nally, plaintiff James J. Yates stated in written answers to interrogatories that he received the Official Offering Statement on the Village on the Heights project but does not recall when. Defendants also note that Yates did not produce the Offering Statement in document production nor was it included in written materials sent to him by his broker. *See* Defendant Laventhol & Horwath's Supplemental Memorandum in Support of Motion for Reconsideration of Class Certification.

406 U.S. at 153–54, 92 S.Ct. at 1472 (citations omitted). This substitution of materiality for the traditional tort concept of direct reliance was extended to open market transactions in *Blackie v. Barrack*, 524 F.2d 891 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976), and was adopted by the Third Circuit in *Peil v. Speiser*, 806 F.2d 1154 (3d Cir.1986). The court in *Peil* held that:

> plaintiffs who purchase in an open and developed market need not prove direct reliance on defendants' misrepresentations, but can satisfy their burden of proof on the element of causation by showing that the defendants made material misrepresentations. If plaintiffs make such a showing the court will presume that the misrepresentations occasioned an increase in the stock's value that, in turn, induced the plaintiffs to purchase the stock.

806 F.2d at 1161.

■ The Supreme Court stamped its imprimatur on the fraud on the market theory in its 4–2 decision in *Basic, Inc., v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). In *Basic*, sellers of a publicly-traded corporation's stock brought suit for false statements by company officials denying pending merger negotiations which, they claimed, artificially depressed the sale price. Quoting from *Peil*, Justice Blackmun wrote:

> "The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business

... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements ... The causal connection between the defendants' fraud and the plaintiff's purchase of stock is no less significant than in a case of direct reliance on misrepresentations."

108 S.Ct. at 988–89, *quoting Peil v. Speiser, supra*, 806 F.2d at 1160–61. Thus, a district court is permitted to presume reliance, or transaction causation, at the class action stage where the nondisclosure *or* misrepresentation can be shown to have adversely affected the market price of a security.

The *Basic* decision did not elaborate on the criteria for an open, developed and efficient market which carries this presumption.[3] However, as Justice Blackmun's opinion suggests, fraud on the market is grounded in dual econometric models: 1) the efficient capital market hypothesis, and 2) the market model of investment decisionmaking. *See* Note, *The Fraud on the Market Theory: Efficient Markets and the Defenses to an Implied 10b–5 Action*, 70 Iowa L.Rev. 975, 979–85 (1985). *See also Basic, Inc.*, 108 S.Ct. at 994–95 (White, J. dissenting) (attacking majority for adopting efficient capital market hypothesis into securities law).

The efficient capital market hypothesis states that the market's pricing mechanism will incorporate all relevant and material information into the market price of a security. *See* Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J.Fin. 383 (1970).[4] Since the mar-

---

**3.** In their treatise on securities fraud, Professors Bromberg and Lowenfels suggest the following definitions:

1) An open market is one in which anyone, or at least a large number of persons, can buy or sell.

2) A developed market is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).

3) An efficient market is one which rapidly reflects new information in price.

4 A. Bromberg & L. Lowenfels, *Securities Fraud & Commodities Fraud*, at § 8.6(635) (1989) (hereinafter "Bromberg"), *quoted in, Cammer v. Bloom*, 711 F.Supp. 1264, 1276 n. 17 (D.N.J. 1989).

**4.** The efficient pricing mechanism is divided into three classifications based on the information analyzed: 1) the *weak form*, which is based on historical price information, 2) the *semi-strong form*, which relies on historical price data plus publicly available information, and 3) the *strong form*, which addresses the effect of nonpublic information in the price of a security.

ket is essentially treated as an agent of the buyer for purposes of reliance on misinformation, the plaintiff must prove that the *market* relied on the fraud. This entails a detailed inquiry into whether the market for the stock is sufficiently active for the pricing mechanism to function and, *a priori*, capable of being affected by the fraud. *See, e.g., Cammer v. Bloom*, 711 F.Supp. 1264, 1284–85 (D.N.J.1989) (in order to determine whether market for over-the-counter stock is efficient, court should examine (1) weekly trading volume (2) reports and analysis by investment professionals (3) presence of market makers and arbitrageurs (4) eligibility to file S–3 Registration Statement, and (5) historical showing of immediate price response to unexpected events or financial releases); *In re LTV Securities Litigation*, 88 F.R.D. 134, 144 (N.D.Tex.1980) (fraud on the market presumption rests on empirical data supporting market efficiency); Bromberg, *supra* note 3, at § 8.6 (court should examine market for individual stock although certain markets such as New York Stock Exchange should be presumed efficient).

■ As the court held in *Stinson v. Van Valley Development Corp.*, 719 F.Supp. 362 (E.D.Pa.1989), *aff'd*, 897 F.2d 524 (3d Cir.1990) ("*Stinson II*") this rationale does not translate to the market for newly issued revenue bonds where price, although not entirely independent of market forces, is set primarily by the issuer and underwriter. Since this market is not efficient or developed under any definition of these terms, the efficient capital market hypothesis cannot support a rebuttable presumption of reliance for the purchaser of municipal revenue bonds. *Stinson II*, 719 F.Supp. at 365 ("investors cannot be said to reasonably rely on market mechanism to reflect an accurate price in illiquid and undeveloped markets ...") *See also Peil v. Speiser*, 806 F.2d at 1161 n. 10 ("While the [fraud on the market] presumption is plausible in developed markets, it may not be in the case of newly issued stock.").

■ The second economic presumption which underlies fraud on the market is the market model of investment decision-making. *See, e.g.*, Fischel, *The Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities*, 38 Bus.Law. 1, 2–5 (1982). The traditional model assumes that investors will analyze all information concerning a security before making an investment decision, thus making more disclosure the key to regulation and enhancing the importance of subjective reliance. The market model deviates from this assumption based on the microeconomic principle of marginal return. It assumes that the marketplace is divided between professional and nonprofessional investors. Since market professionals have superior knowledge and access to information, they regulate the market by transmitting all relevant information into price through their investment decisions. Nonprofessional investors will not receive a positive marginal return on their attempt to gain superior knowledge of a security since their opportunity costs will be high. *See* Note, *supra*, 70 Iowa L.Rev. at 982–84. Simply put, a dollar spent pursuing further information not transmitted into the price of a security will not yield in excess of a dollar's worth of profit. This likewise does not apply to the revenue bond market since price is not affected, and therefore not regulated, by professional investment decisions.

## 2. Fraud Created the Market

The "fraud created the market" doctrine relies on neither of these economic principles to support a rebuttable presumption of reliance in the new issues market. The seminal case is *Shores v. Sklar*, 647 F.2d 462 (5th Cir.1981) (en banc), *cert. denied*, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983). In *Shores*, a purchaser of industrial revenue bonds issued by a city development authority brought suit under Rule 10b–5 upon default of the bonds alleging misrepresentations and omissions in the of-

*See* Fama, 25 J.Fin. at 383. *See also Cammer v. Bloom, supra*, 711 F.Supp. at 1280 n. 25; Note, *The Fraud on the Market Theory and the Effi-* *cient Markets Hypothesis: Applying a Consistent Standard*, 14 J.Corp.L. 443, 472–75 (1988).

fering statement. As in the case at bar, the plaintiff admitted that he did not read the document prior to his purchase of the bonds but relied on the advice of his broker. An en banc Fifth Circuit affirmed the district court's dismissal on summary judgment of plaintiff's claim under Rule 10b–5(2) [5], holding that any presumption of reliance on a nondisclosure created by the *Ute* decision was effectively rebutted by plaintiff's admission that he had not read the offering circular. 647 F.2d at 468. The court, however, reversed the dismissal of plaintiff's complaint under Rule 10b–5(1) and (3) proscribing more pervasive schemes to defraud.[6]

After cataloguing the misinformation in the defendants' offering statement, including a failure to disclose S.E.C. civil actions against the underwriters, gross overestimates of the issuer's net worth and real estate holdings, and defaults on notes financing the underlying project, the court enunciated a standard for a presumption of reliance in the new issues market:

> The requisite element of causation in fact would be established if [plaintiff] Bishop proved the scheme was intended to and did bring the Bonds onto the market fraudulently and proved he relied on the integrity of the securities market ... Bishop's burden of proof will be to show that (1) the defendants knowingly conspired to bring securities onto the market which were *not entitled to be marketed,* intending to defraud purchasers, (2) Bishop reasonably relied on the Bond's availability on the market as an indication of their apparent genuineness, and (3) as a result of the scheme to defraud, he suffered a loss.

647 F.2d at 469–70 (emphasis added) (footnotes omitted). If a plaintiff "proves no more than that the bonds would have been offered at a lower price or higher rate" had the fraud been disclosed, the presumption does not obtain. *Id.* "That is, if an investor alleges reliance on the integrity of the market to set the price, she is asserting a claim under *Blackie;* if she alleges a comprehensive scheme to market a security not entitled to be on the market, she is relying on *Shores."* Note, *Dredging the Shores Doctrine: Trends in the Fraud on the Market Theory in the New Issues Context,* 23 Geo.L.Rev. 731, 754 (1989).

Several courts, including this court's prior opinion, have struggled with application of the *Shores* doctrine in less egregious cases of fraud, especially under the limited evidentiary record presented at the class certification stage. *See Bexar I,* 125 F.R.D. at 631–32, and cases cited therein. As discussed above, the fraud created the market presumption does not rely primarily on the sort of empirical analysis which resolves factual issues through expert testimony. Instead, fraud created the market presents a more fact-dependent evaluation which implicates the court's limited role under Fed.R.Civ.P. 23. The court's opinion in *Bexar I* attempted to resolve this tension in favor of the Supreme Court's admonition that district courts should not delve excessively into the merits at the class action stage. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974). This was supported by post-*Shores* cases such as *T.J. Raney & Sons, Inc. v. Fort Cobb Okl. Irrigation Fuel Auth.,* 717 F.2d 1330 (10th Cir.1983), *cert. denied sub nom., Linde v. T.J. Raney & Sons, Inc.,* 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984), *Ross v. BankSouth, N.A.,* 837 F.2d 980, *vacated,* 848 F.2d 1132 (11th Cir.1988), and *Anderson v. Bank of the South, N.A.,* 118 F.R.D. 136 (M.D.Fla.

---

**5.** Rule 10b–5(2) provides, *inter alia,:*

> It shall be unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce ...
> (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading....

17 C.F.R. § 240.10b–5(2).

**6.** The remaining sections of Rule 10b–5 make it unlawful:

> (1) to employ any device, scheme, or artifice to defraud, or
> (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of a security.

17 C.F.R. § 240.10b–5(1), (3).

1987) which explored the scope of the *Shores* presumption at various procedural stages. It is the conclusion of the court that the Eleventh Circuit's en banc reconsideration of *Ross* and the Third Circuit's summary affirmance in *Stinson II* alters this balance.

■ The Eleventh Circuit in *Ross v. BankSouth, N.A.*, 885 F.2d 723 (11th Cir. 1989) (en banc) convened en banc to define the scope of the *Shores* presumption. The facts in *Ross* were quite similar to those *sub judice*. High yield revenue bonds were issued through a municipal authority to finance retirement and nursing home facilities. Repayment depended solely on occupancy fees. Consequently, the number of pre-sales and amount of deposits collected were integral to the viability of the financing. A fractured court found that the defendants failure to disclose inflated pre-sales, inadequate deposits and unrealistic projections on occupancy rates did not state the degree of fraud required under *Shores*. Adopting a narrow view of fraud created the market, the majority stated:

> The burden imposed by the first element [of *Shores*] is a substantial one. *Shores* is based on the understanding that although it is reasonable to rely on the market to screen out securities that are so tainted by fraud as to be totally unmarketable, investors cannot be presumed to rely on the primary market to set a price consistent with the appropriate risk.

885 F.2d at 729. The court thus promulgated an "economic unmarketability" test, i.e., the plaintiff must show that, had the fraud been disclosed, the bonds could not have been marketed at any combination of price and interest. *Id.* at 731. The majority buttressed this empirical showing with a scienter requirement. The plaintiff must also prove that the defendants knew the bonds were unmarketable, or acted in reckless disregard of the fact, but decided to issue them anyway with the intent to defraud the public. *Id.* at 729–30.

The concurrence and dissent in *Ross* took issue with the majority's "economic unmarketability" test. Arguing that any bond can theoretically be marketed at some combination of price and interest, Judge Tjoflat chastised the majority for taking away with one hand what they gave with the other. 885 F.2d at 736 (Tjoflat, J., concurring). Five of the ten judges considering the issue believed a "factual unmarketability" test would be more consistent with the *Shores* reasoning. This test focuses on whether the bonds were marketable at the actual price and interest rate had there been full disclosure.[7] Under this expansive view of *Shores* the bonds would not have to be worthless nor the project an entire sham. Rather, the focus would return to the materiality of the misrepresentations or nondisclosures and their affect on the market. *See* Fischel, *supra*, 38 Bus. Law. at 12 (arguing that a plaintiff should only have to show that "a security would have sold for a different price had the true information been known at the time of sale."). Despite persuasive arguments in favor of this approach, the court interprets the Third Circuit's decision to summarily affirm *Stinson II* to be a rejection of this test.

In *Stinson II*, Judge John B. Hannum of this court denied a motion for reconsidera-

---

**7.** The concurrence and dissent differed on upholding *Shores* itself. Judge Tjoflat, who dissented in *Shores* prior to the creation of the Eleventh Circuit, believed the court should overrule *Shores* as unworkable in practice and unreasonable in theory. However, he argued that if *Shores* applied it should not be interpreted so strictly as to make it of little practical use to plaintiffs. He found that the majority's decision to limit *Shores* to sham transactions resulted in just such an anomaly. Judge Tjoflat would require a plaintiff to show that, had the fraud been disclosed, some regulatory body, usually the municipal authority providing the tax deduction for investors, would not have permitted the bonds to be issued at their actual price and interest rate.

Judge Clark's dissent, joined by Judges Kravitch, Johnson and Hatchett, argued for an expansive view of *Shores* along the lines of Judge Tjoflat's factual unmarketability test. They would not, however, look to a regulatory authority to intercede, but would allow the plaintiff to rely on the "integrity of the primary market underwriting process to set a non-fraudulent price...." 885 F.2d at 749–50 n. 7 (Clark, J., dissenting). This test would apparently test marketability based on the actual offering price.

tion of plaintiff's complaint asserting Rule 10b–5 violations in a similar offering of revenue bonds financing construction of a health care facility for the elderly. The court held that plaintiff's averments did not meet the threshold showing of economic unmarketability required by *Shores*.[8] The court found that:

> [T]he rationale of *Peil* and *Basic* can properly be extended "where the promoters knew that the subject enterprise was worthless when the securities were issued, and successfully issued the securities only because of defendants' fraudulent scheme." *Abell v. Potomac Ins. Co.,* 858 F.2d 1104 (5th Cir.1988).... The Court notes that the focus of its inquiry is the value of the bonds at the time of issuance-whether the promoters knew that the development project pledged to retire the bonds was patently worthless, a sham or hoax.

719 F.Supp. at 366. The Fifth Circuit's decision in *Abell* has since been vacated by the Supreme Court in light of its decision in *H.J., Inc. v. Northwestern Bell Tel. Co.,* — U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) and is therefore of dubious precedential value despite the fact that it addressed an unrelated issue under civil RICO. *Abell, supra,* 858 F.2d 1104, *vacated sub nom. Fryar v. Abell,* — U.S. ——, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989). However, the Third Circuit's decision to affirm *Stinson* regardless of its reliance on *Abell* negates any inference that the *Stinson* holding is not the law of this circuit. Consequently, plaintiffs in this case must show that the Village on the Heights project was patently worthless, that the Trinity bonds would have been unmarketable if the failure of the two prior projects were disclosed, and that defendants knew of this fact or recklessly disregarded it.

It should be noted that the reasoning supporting this choice is not without merit. Although "the securities laws and regula-tions have a purpose broader than merely criticizing ever-lengthening, complex prospectuses", *Shores,* 647 F.2d at 464, neither do they provide a form of "investors insurance". *List v. Fashion Park, Inc.,* 340 F.2d 457, 463 (2d Cir.), *cert. denied sub nom. List v. Lerner,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). Moreover, the Supreme Court has consistently stated that disclosure is the philosophy of the securities laws. *See, e.g., Santa Fe Ind., Inc. v. Green,* 430 U.S. 462, 477–78, 97 S.Ct. 1292, 1302–03, 51 L.Ed.2d 480 (1977). By restricting the recovery of plaintiffs who fail to read offering documents, especially in the high risk/high yield revenue bond market, the courts are implementing this view for if a plaintiff could recover without reading the offering documents, defendants will have little incentive to disclose. To the extent that this returns the securities field to the otherwise discarded doctrine of *caveat emptor,* it is a problem for Congress to redress.

### 3. Application of Fraud Created the Market

■ In the words of Winston Churchill, "I pass with great relief from the tossing sea of Cause and Theory to the firm ground of Result and Fact." W. Churchill, *The Malakand Field Force,* at 10 (1898). The "touchstones for application of a presumption of reliance are common sense and probability," *Stinson II,* 719 F.Supp. at 365, in light of the "most likely proof at trial" *Sharp v. Coopers & Lybrand,* 649 F.2d 175 (3d Cir.1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982)—a test which courts are much more capable of administering. Although this may appear to broaden the traditional Rule 23 analysis, the requirements of commonality, typicality and predominance mandate denial of class certification if the evidentiary record before the court does not satisfy

---

**8.** The plaintiff alleged that the offering statement in *Stinson* was fraudulent due to (1) failure to disclose the project's inadequate working capital (2) false pledges by the issuer to insure and market the project (3) inaccurate forecasts of occupancy rates (4) failure to properly disclose and analyze depressed market conditions, and (5) failure to properly analyze the impact of a 20% moderate income tenants requirement. 719 F.Supp. at 366 n. 8. Several other allegations of fraud concerning the operation of the project were rejected by the court's denial of plaintiff's motion to amend the complaint pursuant to Fed.R.Civ.P. 15.

the first element of *Shores*. This record clearly does not.

In *Bexar I*, the court held that the complaint stated primarily an omissions case which entitled plaintiffs to a rebuttable presumption of reliance under the *Ute* doctrine. Regardless of the taxonomy between omissions and misrepresentations, plaintiffs' admissions that they did not read the offering statement prior to the purchase of their Trinity bonds effectively rebuts this presumption. The court must then determine whether the allegations of fraud satisfy the "substantial burden" that, had there been full disclosure, the bonds could not have been marketed. Plaintiffs have not met this burden. The Village on the Heights project was constructed. Although occupancy rates fell behind projections, they were not insubstantial. The Trinity Foundation is in bankruptcy but will pay some return on plaintiffs' investments. In other words, the bonds were not patently worthless at the time of issuance, nor was the project a sham designed from its inception to defraud the public. The court will thus decertify the class given the current representative class plaintiffs. In addition, the complaints stated by the named plaintiffs are dismissed pursuant to Fed.R.Civ.P. 12 for failure to prove reliance.

■ One point remains. Plaintiffs argue that the most likely proof at trial will show that they relied on advice from their brokers who, in turn, relied on the offering statement and feasibility study in recommending the bonds to their clients. This is the kind of attenuated reliance upheld by the court in *Panzirer v. Wolf*, 663 F.2d 365 (2d Cir.1981), *vacated as moot*, 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982) where plaintiff relied on a Wall Street Journal article which summarized information from a company's annual report. However, the *Shores* court rejected this argument *sub silentio* by resorting to the fraud created the market analysis even though plaintiff alleged that he relied on the advice of his broker. Other courts have rejected this form of reliance as breaking the causal chain. *See, e.g., Masri v. Wakefield*, 106 F.R.D. 322, 325 (D.Colo.1984); *Seiler v. E.F. Hutton & Co.*, 102 F.R.D. 880, 890 (D.N.J.1984); *McNichols v. Loeb Rhoades*, 97 F.R.D. 331, 334 (N.D.Ill.1982). *See also* Bromberg, *supra,* at § 8.6(661). Unlike the situation in *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 (11th Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 421 (1988), plaintiffs' brokers are not named defendants alleged to be part of the conspiracy to issue worthless bonds. For the same reasons supporting the narrow view of *Shores*, the court will not extend the chain of causation through a purchasers broker not involved in the underwriting.

## III. CONCLUSION

The court concludes that in order to receive a rebuttable presumption of reliance under the fraud created the market doctrine recent case law requires a Rule 10b–5 plaintiff to show that a purchased security could not have been marketed at any combination of price and interest had full disclosure been made. Since plaintiffs allegations do not rise to this level, and, since no class representative before the court relied directly on the offering documents, individual questions of reliance predominate and the class must be decertified. Finally, since plaintiffs cannot satisfy the reliance requirement of Rule 10b–5, their individual complaints must likewise be dismissed.

### ORDER

AND NOW, TO WIT, this 10th day of April, 1990, in consideration of defendants' motion for reconsideration of the court's order granting plaintiffs' motion for class certification pursuant to Fed.R.Civ.P. 23, and defendants' motion for reconsideration of the court's order denying defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12, it is hereby ORDERED that defendants' motions are *granted*. Accordingly, the class is *decertified* and plaintiffs' complaints are *dismissed*.