Oscar GRUBER, Raymond Shatz, and Larry Greenstein, suing on behalf of themselves and all others similarly situated

v.

PRICE WATERHOUSE.

Civ. A. No. 86–3976.

United States District Court, E.D. Pennsylvania.

Oct. 24, 1991.

Leonard Barrack, Sheldon Albert, Anthony Bolognese, Philadelphia, Pa., for plaintiff.

John G. Harkins, Patricia L. Freeland, Robert L. Hickok, Margaret A. Suender, Steven A. Reed, Philadelphia, Pa., for defendant.

## OPINION

DITTER, District Judge.

This action is yet another piece of litigation concerning AIA Industries, Inc. and its demise. *See In re AIA Industries, Inc. Securities Litigation,* Master File No. 84–2276 (E.D.Pa.). Here, plaintiffs charge an accounting firm produced fraudulent audits and financial statements. Plaintiffs claim they relied on these materials when purchasing AIA stock, and therefore allege violations of Section 10(b) of the Securities and Exchange Act of 1934, Rule 10b–5, and common law.

Defendant Price Waterhouse ("PW") has moved for summary judgment and decertification of the class. Having considered the parties' briefs and oral arguments, I will sever the named plaintiffs from the class, grant summary judgment for the defendant on these plaintiffs' claims, and grant the class' attorneys 45 days to find suitable named plaintiffs to proceed on behalf of the class.

### I. BACKGROUND

American International Airways ("AIA") was the principle subsidiary of AIA Industries, Inc. AIA began as a predominantly charter airline with routes to Atlantic City,

but beginning in December, 1982, AIA commenced scheduled service to Florida and the midwest.

In connection with these and other expansions, AIA issued 2,150,000 shares of stock through an initial public offering on July 21, 1983. The lead underwriters for the offering were Janney Montgomery Scott and Thomson McKinnon. The opening price was ten dollars per share, and various customers bought the entire lot on the first day. In fact, the offering was oversubscribed by 150 thousand shares. These transactions produced over 18 million dollars in proceeds for AIA.

PW was AIA's accountant during this period, and PW's work product appeared in the prospectus. These materials included AIA financial statements for three periods: the seven months preceding March 31, 1982; the eight months preceding November 30, 1982; and the four months preceding March 31, 1983. For the first two periods, PW produced audited statements and both showed losses. The last period was unaudited and revealed a profit.

The named plaintiffs in this action all bought shares through the initial public offering on July 21, 1983, and all paid the opening price. Each, however, had a slightly different motive and level of information when he purchased.

Oscar Gruber bought 100 shares of AIA stock through Barry Adelman, his broker at Thomson McKinnon. Gruber had spoken with Adelman about acquiring new issues (Gruber thought they were particularly lucrative investments) and when the AIA issue appeared, Adelman arranged the sale. Gruber did not read the prospectus before buying the AIA stock, and when he received a prospectus after his purchase, Gruber glanced at it only briefly.

Larry Greenstein bought 200 shares of AIA stock through his broker at Janney Montgomery Scott. At his deposition, Mr. Greenstein also admitted he had not read the prospectus before buying the AIA shares. Mr. Greenstein also recounted that when he finally did read the prospectus, he ignored the financial statements. Mr. Greenstein, though, testified he relied on his broker's advice when making his purchase.

Finally, Raymond Shatz bought 100 shares of AIA. Mr. Shatz testified at his deposition that he became interested in AIA through newspaper articles and his wife's purchase of AIA stock. Mrs. Shatz was a secretary at Janney Montgomery Scott.

Mr. Shatz read the prospectus before his purchase, but his testimony demonstrates he could have relied only on the unaudited financial statements. Mr. Shatz indicated he was favorably impressed with AIA's "healthy growth" in 1983, but the only figures showing profit were unaudited statements. The two statements PW audited revealed financial losses.

## II. DISCUSSION

### A. Summary Judgment.

Because it seeks summary judgment, defendant must show there are no genuine issues of material fact, even after interpreting all of the evidence in a light most favorable to the plaintiffs. An issue is genuine if a reasonable fact-finder, considering the evidence presented, could find for the non-moving party. With these general principles in mind, I will now turn to the merits.

### B. Reliance.

■ Plaintiffs' reliance on the financial information for which PW was responsible is a necessary element of their claims for common law fraud, *see Reimer v. Tien*, 356 Pa.Super. 192, 514 A.2d 566, 569 (1986), and claims under Section 10 of the 1934 Act, *see Basic v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988). Reliance may be established in either of two ways: by showing actual reliance on the material in question, or by showing facts which justify the presumption of reliance. Defendant claims the plaintiffs have not shown the necessary facts to satisfy either method.

I agree.

## 1. *Actual Reliance.*

Plaintiffs' first avenue for establishing reliance would be to show actual reliance. The undisputed facts foreclose this path. Mr. Gruber and Mr. Greenstein admitted they never read the AIA prospectus before purchasing their stock. In addition, both testified that when they did read the prospectus, they ignored the financial statements.

■ Defendant attempts to bolster its argument by pointing to their motive for buying the stock. Defendant notes Mr. Gruber bought the AIA stock as part of a larger strategy to acquire new issues. Defendant adds this motive further undercuts any chance of proving reliance on the PW audited statements.

Of course, such a motive would not generally be dispositive on a reliance question. Just because an investor is interested in a particular type of issue does not mean he will blindly buy everything in the category. Nevertheless, in Mr. Gruber's case, the new issue factor was primary, and the PW audited statements were irrelevant.

■ Mr. Greenstein's motive for buying AIA is more immediately instructive on the reliance issue. Mr. Greenstein spoke to his broker about AIA, but they discussed what the company actually did, not its financial health. Mr. Greenstein recalled his brokers description of AIA:

Well, the basic response, as far as the company was concerned, was that they were going to be running strictly junkets and airlines from—charters from various eastern cities, as far west as Chicago, as I recall, to Atlantic City to the airport, and then bus them to the casinos, plane loads. That was their basic—my basic understanding of the company.

After characterizing his conversations with his broker in this way, Mr. Greenstein was explicitly asked if he made any other inquiries.

Q. Okay. Did you ask him any questions, do you recall any additional questions?

A. No, I don't think I did. I don't think I—the industry was new. They were the first one of their kind in this particular area in Atlantic City. And based on the recommendations, I felt it was a very good speculation.

■ Defendant makes a similar motive argument concerning Mr. Shatz. Defendant claims Mr. Shatz discovered the AIA stock through his wife. In this case, though, Mrs. Shatz was obviously not the overriding factor because Mr. Shatz read the prospectus before his purchase.

Of course, reading the prospectus does not prove reliance on PW's audited statements, and the evidence shows the statements were not a factor in Mr. Shatz's decision. Mr. Shatz's deposition testimony shows he only considered the financial statements from the unaudited period. He said he was impressed with AIA's earnings, and both of the audited periods showed losses.

Plaintiffs' counsel counters that Mr. Shatz did inspect the financial statements, and offers this extract from his deposition testimony.

I'm sure I read their balance sheet, and their financial statements, which was one of the things that impressed me ... of course, the fact that they had a valid statement with the prospectus from a very respected accounting firm sort of cemented my feeling that the company was in a good direction.

I am not persuaded, though. Mr. Shatz's statement essentially says two things. First, "I read the statements," and second, "I relied on the fact that PW audited the company." As to reading the statements, Mr. Shatz's other testimony shows that while he might have read the audited statements, he relied on the unaudited period which showed a profit.

When asked to describe specifically what he relied on Mr. Shatz responded:

A. ... I could see that their balance sheet, 1983 over 1982, reflected some healthy growth.

Q. Now you're looking at what page now?

A. That was page 57—their—

Q. And page 58 compares November 30, '82, with March 31, '83; is that correct?

A. Yes.

Page 58, it showed where their net income, loss actually, in 1982 was reversed to a 30 cent profit, which was encouraging. It showed that they were headed down the right direction. It also shows that in 1982 their operating revenues were eight million six. 1983 they had grown to 14 million nine. And so that impressed me.

PW, however, did not certify the statements from the profitable period. In fact, both page 57 and 58 of the prospectus have the word "unaudited" in bold print at the top of the page. As a result, while it might be clear he read the financial statements, Mr. Shatz did not rely on PW's audited statements when he decided to purchase AIA stock. Moreover, he cannot even claim he was confused about the statements' source because they were so clearly marked.

Mr. Shatz also contended he trusted the reports because they were associated with PW. This assertion is not persuasive. To equate reliance and respect would mean that anytime a "respected" person or firm was involved with a financial transaction it would become an insurer of every other participant's work product and representations.

PW provided certain financial documentation for the AIA prospectus, and it is responsible for all of the legal consequences of its work. PW is not, however, responsible for all information in the prospectus. If the prospectus had misrepresented the type of engines on the planes and PW had nothing to do with that misrepresentation, PW would not be liable. The same is true for financial representations that did not carry PW's certification.

For these reasons, Mr. Shatz cannot show actual reliance on PW's audited statements. While he may have read the PW financial statements, it was the positive

earnings, not the losses reflected in the audited figures, that prompted his buy order. In addition, he may not claim PW's work on portions of the prospectus places PW's imprimatur on the entire prospectus.

■ Finally, the named plaintiffs claim they relied on their broker's advice when purchasing the AIA stock. They cite *Wiley v. Hughes Capital Corp.*, 746 F.Supp. 1264 (D.N.J.1990), and argue there is an issue of material fact concerning whether the brokers relied on the PW statements when recommending the AIA stock. Under the circumstances, though, I find no reasonable jury could conclude the brokers here were relying only on PW's statements when recommending AIA stock before July 21, 1983.

First, the deposition testimony does not support this claim. Oscar Gruber bought AIA stock because it was a new issue. Raymond Shatz bought AIA stock based on information from his wife and the newspapers. Neither can claim reliance on their broker. Larry Greenstein relied on his broker, but his testimony clearly shows the PW statements were not the basis of his broker's advice.

There is no doubt brokers suggest purchasing stock in companies that have lost money, and reporting losses does not automatically insulate an accounting firm from this kind of reliance argument. As defendant contends, though, no broker would base a purchase suggestion exclusively on a company's losses. Rather, brokers base their recommendations on factors that explain the loss or put it in perspective. A broker might tell a client the company only lost a small amount relative to its gross. A broker might explain how some extraneous, unpredictable, or temporary problem plagued the company. A broker might tout the company's potential describing its great future, its lucrative market niche, or any number of other factors. Most assuredly, though, a broker would not say, "buy this stock, the company keeps losing money." [1]

---

**1.** Mr. Greenstein's testimony demonstrates this point. He explained how his broker empha-

sized what the company did, and how it was

In this case, the only audited statement PW made was essentially, "AIA lost this much money during these two periods." The rest of the materials did not carry PW's certification. Therefore, all of the materials explaining the loss or putting it in perspective—all of the materials that would substantiate a recommendation to buy—were not PW's. Any reliance argument based on what Mr. Greenstein's broker said about PW's work must fail. In fact, even if the broker relied on the positive earnings, there was no reliance because the statement was unaudited.

One way to illustrate this point is by assuming the unaudited period had pronounced a loss. If this were the case,[2] a broker would have used other information in the report to explain what a good investment AIA was. He certainly would not have relied on three negative PW statements.

The same is true when the unaudited period shows earnings. While the broker may refer to the losses as a reference point, the information he uses to persuade a potential buyer is the profit reflected in the most recent period. Therefore, while the audited statements may have come up, they could not have been the persuasive aspect of any sales pitch.

Because none of the named plaintiffs can prove actual reliance, their common law fraud action must fail. Their claim under 10(b) of the 1934 Act, though, could proceed if it would be appropriate to presume reliance.

## 2. *Presumed Reliance.*

The named plaintiffs have identified three theories under which they contend I should presume the reliance element of their section 10(b) claim: (1) the *Affiliated Ute* presumption; (2) the fraud on the market theory; and (3) the fraud created the

market theory.[3] None of these theories applies here.

i. The *Affiliated Ute* Presumption.

■ *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), reports that in certain situations, a party has an affirmative duty to disclose information concerning a securities transaction. The Supreme Court held that where this duty exists, a court may presume plaintiff's reliance rather than requiring that plaintiff prove it.

In *Ute,* the members of an Indian tribe created a corporation and issued stock to divide up the tribe's assets. The corporation's nature, however, made it practically impossible to value each share. Because of this problem and worries that tribe members could be easily duped, the corporation promulgated protective measures. First, the corporation set up a system to discourage sales to anyone but tribe members and printed the resulting restrictions on each stock certificate. Second, the corporation designated a bank to hold the shares and be the sole transfer agent for the stock.

Soon after, two bank employees began trading the stock and created a lucrative market outside of the tribe. The practical result was two markets existed, and tribe members received less for their stock in the primary market than non-members did in the second market. Due to their efforts, the bank employees had numerous orders for available shares from non-members. The resulting sales made considerable profits for the employees.

The Court held the bank and these employees had an affirmative duty to disclose these facts, and that the plaintiffs could presume reliance on the failure to disclose. Justice Blackmun wrote:

> Under the circumstances of this case, involving primarily a duty to disclose,

---

unique. The discussion did not rely on PW's financial statements.

**2.** Had the unaudited period actually shown a loss, the initial public offering would have never occurred because Janney Montgomery Scott made positive earnings a precondition to underwriting the deal.

**3.** There is some confusion as to whether the plaintiffs are proceeding with their fraud created the market argument, or their fraud on the market argument. To bypass a potential problem, I will discuss both theories.

positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. *Id.* 92 S.Ct. at 1472–3.

From the outset there has been considerable controversy over the *Ute* exception's boundaries. On its face, *Ute* allows courts to presume reliance where the claim involves an omission. A party's misrepresentations, however, do not trigger the *Ute* presumption.

This distinction is easier to describe than make.

The problem, as another court has written, is that through clever pleading, "every fraud case based on material misrepresentation could be turned facilely into a material omissions case." *Beck v. Cantor, Fitzgerald & Co.*, 621 F.Supp. 1547, 1556 (N.D.Ill.1985). Astute plaintiffs could merely allege material misrepresentations as a failure to disclose the truth.

Here, I am faced with this exact problem. Plaintiffs argue they assert misrepresentations *and* omissions. On the other hand, defendant responds the complaint might use the word omission here and there, but really only charges PW with misrepresentations. Courts have taken two approaches to this issue.

The first holds *Ute* applies only for pure omissions cases. When pleadings show both misrepresentations and omissions, the *Ute* presumption is inapplicable. *See, e.g., Cavalier Carpets, Inc. v. Caylor*, 746 F.2d 749 (11th Cir.1984); *Sheftelman v. Jones*, 667 F.Supp. 859 (N.D.Ga.1987); *Beck v. Cantor, Fitzgerald & Co.*, 621 F.Supp. 1547 (D.C.Ill.1985). This approach, though, throws out the baby with the bath water because it forecloses the *Ute* presumption in every mixed case. It is hard to imagine a case that involves only omissions, and even Justice Blackmun wrote that *Ute* involved *"primarily* a duty to disclose" not *only* a duty to disclose.

Moreover, this approach warps the pleading process by encouraging parties who wish to argue *Ute* to leave misrepresentation allegations out of their complaints. In this way, the approach even conflicts with the ability to plead in the alternative. *See* Fed.R.Civ.P. 8(e)(2).

The second approach, which controls in this circuit, is more flexible. For this view, *Sharp v. Coopers & Lybrand*, 649 F.2d 175 (3d Cir.1981), and *Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88 (2d Cir.1981), provide guidance.

The *Wilson* court acknowledged the elusive distinction between misrepresentations and omissions, but opted for a middle ground rather than a bright line rule. To sort things out, *Wilson* stepped back and looked to the theory behind the *Ute* presumption. As Judge Oakes wrote: "The labels by themselves ... are of little help. What is important is to understand the rationale for a presumption of causation in fact in cases like *Ute*, in which no positive statements exist: reliance as a practical matter is impossible to prove." *Id.* at 93.

The Third Circuit reiterated this rationale in *Sharp*, another mixed case of misrepresentations and omissions, but the *Sharp* court went further. *Sharp* explicitly makes the inquiry a common sense one. After noting, "We ... presume reliance only where it is logical to do so," *Sharp*, 649 F.2d at 188, Judge Aldisert wrote: "We conclude that the proper approach to the problem of reliance is to analyze the plaintiff's allegations, in light of the likely proof at trial, and determine the most reasonable placement of the burden of proof reliance." *Id.*

In *Sharp*, an accounting firm wrote an opinion letter concerning complicated, tax driven, oil investments. The court found certain statements in the accountant's letter were factually wrong. Instead of calling these statements omissions because no one corrected them, the court considered them misstatements. The *Sharp* omissions concerned the affiliation between the various players in the underlying financial transactions. The main company was borrowing money from a bank it owned. Because of the omission, the *Sharp* court

placed the burden of proving non-reliance on the defendant.

In this case, the complaint alleges PW incorrectly reported the financial dealings between AIA and ITG, a major AIA client. As a result, the PW financial statements inaccurately reported how much ITG owed AIA in loans and for services rendered. In addition, the statements incorrectly determined certain costs to be deferred charges, and understated AIA's operating losses. These errors included inaccurate reporting of payments to two high level AIA employees.

While the complaint uses language to suggest an omission or failure to disclose in at least seven counts (¶¶ 33, 34, 39, 57, 59, 74, 85), the crux of the plaintiffs' allegations is that PW's materials did not accurately portray AIA's financial health. Plaintiffs proof at trial would reflect this fact. As a result, common sense dictates this is a misrepresentation case.

The reason is straightforward. A financial statement is supposed to be an accurate portrayal of a company's financial situation. As a result, missing financial information makes the portrayal inaccurate. In these circumstances we would say it misrepresents the company's true financial situation. For instance, if an accounting firm reports earnings figures that are too low, we do not say the firm omitted to report earnings. We say the earnings figures are wrong.

By the same token, failures to report payments, loans, losses, and other dealings are not an omission in this context. They create a financial statement that misrepresents the company's financial profile.

An accounting firm's behavior certainly could constitute an omission. For example in *Sharp*, the defendant failed to disclose a relationship between the participants in an underlying transaction. This omission did not concern financial information, though. Rather, it concerned information that could never have been evident from the face of the financial statements. After all, people can look at financial reports and suspect the numbers are wrong, but from the face of the documents, they can never suspect

some relationship that would create conflicts of interest.

In this case, the plaintiffs have not offered a single allegation that displays the *Sharp* omission's characteristics. The closest assertion concerns Edward T. Lack, who left PW to become the controller at AIA Industries. Under the reverse scenario, failure to disclose this relationship might have constituted an omission.

Had Mr. Lack left AIA to work at PW and retained a significant interest in AIA (perhaps some stock), he might have been motivated to misrepresent the financial statements because he might have profited from any transgressions. There would be no way for an investor to anticipate such a possibility unless PW disclosed the facts. In this case, however, Mr. Lack left PW to work at AIA. As a result, he was not responsible for preparing PW's audit and therefore did not undermine the normal motivation to get the figures correct.

It follows that any financial statement inaccuracies were misrepresentations because they failed to portray AIA's actual financial health. Failing to report Mr. Lack's relationship to PW was not an omission because he was not preparing the PW audits, and therefore did not reduce PW's motivation to do a careful job.

For these reasons, I conclude the *Ute* exception does not apply in this case.

ii. The "fraud on the market" theory.

■ Another avenue that leads to presumed reliance is the "fraud on the market" theory. In describing this idea, the Supreme Court has relied on the Third Circuit's explanation:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendant's fraud and the plaintiff's purchase of stock in such a

case is no less significant than in a case of direct reliance on misrepresentations. *Basic v. Levinson*, [485 U.S. 224] 108 S.Ct. 978, 988–9 [99 L.Ed.2d 194] (1988) (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3d Cir.1986).

The critical issue in a *Basic* analysis is whether the particular securities market is open and developed. *Basic* explains the "fraud on the market" theory can only apply where a stock's price accurately reflects its value. The idea is that when information flows freely and stocks trade quickly and efficiently, price will closely reflect value. Under this theory buyers are not obliged to prove reliance on any false information because it may be assumed they relied on accuracy of the price and that the price reflected all of the news in the market. If a party introduced any positive data that was false, it would necessarily affect all buyers because they would all pay the fraudulently inflated price.

Given this theoretical underpinning, the "fraud on the market" theory can not apply to initial public offerings. In an initial public offering it cannot be assumed price reflects value because there is simply no open and developed market. Instead, interested parties have set the price. This characteristic rules out the theory in two respects. First, the initial price represents a biased view of value because the promoters are self-interested, and second, the price cannot change to reflect true value. Therefore, a buyer cannot assume the price he pays reflects all of the information in the market.

The particulars in this case only strengthen this point. Here, there was an oversubscription for the initial offering and the price rose immediately after the stock began to trade publicly. Analyzed solely from the economic standpoint, these facts show the initial offering price was too low. First, there was an excess of demand, and then when the market finally opened, price rose to reflect that excess. Moreover, the named plaintiffs bought all of their stock on the first day at the opening price. Since it cannot be assumed the price they paid represented all the information available to the market, including any errors in PW's statements, the "fraud on the market" theory does not apply.

### iii. The "fraud created the market" theory.

Plaintiffs identified one more path to find a reason to presume reliance: the "fraud created the market" theory. The Fifth Circuit introduced this doctrine in *Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981), and while a few district courts in this circuit have discussed the theory, the Third Circuit has yet to rule.

"Fraud created the market" is a circular theory based on faith in the market itself. The theory presumes the securities market is legitimate, and that buyers rely on its legitimacy. As a result, the theory recognizes that the market inevitably confers legitimacy on all of its products; in effect, the market certifies that each traded security has some value. Because of this certification, buyers may presume any traded security in the market must be worth at least something, or else it would not be there.

The market does not certify a particular value, though. Buyers can only infer the security represents some real entity. Therefore, "fraud created the market" only applies where the underlying business is an absolute sham, worthless from the beginning. Buying into a bad deal does not trigger this presumption.

Two recent Eastern District cases illustrate this point. In *Stinson v. Van Valley Development Corp.*, 719 F.Supp. 362 (E.D.Pa.1989), plaintiffs bought bonds issued for construction of a retirement complex. The plaintiffs later sued alleging financial mismanagement in the project's planning and development. The court denied the "fraud created the market" argument because the project existed. Judge Hannum wrote: "[E]ven where a project was misconceived and badly managed, this alone does not amount to the kind of unmarketability warranting applicability of the fraud-created-the-market presumption." *Id.* at 366.

Judge Hannum concluded a plaintiff would have to show "the promoters knew

that the subject enterprise was worthless when the securities were issued, and successfully issued the securities only because of defendant's fraudulent scheme." *Id.*

*In Re Bexar County Health Facility Development Corporation Securities Litigation,* 130 F.R.D. 602 (E.D.Pa.1990), another bond issue case, delivers the same message. In determining whether the bonds could be marketed, Chief Judge Bechtle wrote:

> The Village on the Heights project was constructed. Although occupancy rates fell behind projections, they were not insubstantial. The Trinity Foundation is in bankruptcy but will pay some return on plaintiff's investments. In other words, the bonds were not patently worthless at the time of issuance, nor was the project a sham designed from its inception to defraud the public. *Id.* at 611.

These cases clearly show that the "fraud created the market" doctrine cannot apply to real businesses. Even where management is thoroughly corrupt, and purposefully bankrupts a firm, the existence of an original, actual entity forecloses applying the doctrine.

Given these narrow restrictions, the AIA matter simply does not fall within the "fraud created the market" doctrine. AIA may have been a bad idea from the start. It may have been a great idea that poor, or even dishonest, management killed. It may have been a lot of things, but it was not a sham business. AIA was an operating airline. It had planes, hangers, and runway space, and it used these assets to carry passengers. Plaintiff's complaint even alleges this point:

> American International Airways, Inc. ("AIA Airways"), AIA Industries principal subsidiary was formed in September 1981 to initially provide airline services to the gaming industry in Atlantic City, New Jersey. In addition to the gaming charters, AIA Airways provided public charter flights sold directly to tour operators. AIA Airways also offered two types of scheduled service: (i) flights to and from several Florida Cities, initiated in December 1982; and (ii) flights to and from various northern and midwestern

cities, initiated in February 1983. The latter were marketed as a "stay and play" package in conjunction with certain hotel casinos in Atlantic City and in addition to the flight, in some instances hotel rooms and/or other give-aways were provided by the hotel casino. *Plaintiff's complaint* at ¶ 16.

Even under the more lenient "fraud created the market" standard in *Wiley v. Hughes Capital Corp.,* 746 F.Supp. 1264 (D.N.J.1990), reliance for these plaintiffs cannot be presumed. *Wiley* adopted a factual marketability test which asks: "was the security subject to fraud so pervasive as to undermine its genuineness and render it unworthy of trading in a regulated securities market." *Id.* at 1293. *Wiley* interpreted these words to mean totally worthless. Judge Lechner wrote:

> [The plaintiffs] have asserted there were no assets of the corporation beyond the funds obtained from the fraudulent issuance of Hughes Capital Securities; the acquisition targets are alleged to be worthless companies and Hughes Capital had not obtained letters of credit or other financial assistance for the alleged plan to acquire the target companies. Moreover, the only potential assets of Hughes Capital, the targeted acquisition companies, were owned or controlled by officers or directors of Hughes Capital. While even extraordinarily risky investments may be marketable at some combination of price and interest rate, it is inconceivable that a reasonable investor would purchase stock in a corporation that has no legitimate business purpose and which contains no assets, or the only assets of which are worthless acquisition targets owned by principles of the holding corporation. *Id.* at 1294.

As I noted above, AIA had assets and a legitimate business purpose. It therefore does not fall within *Wiley's* contemplation of factual unmarketability.

In this instance, it would be inappropriate to presume reliance under the "fraud created the market doctrine."

In summary, because plaintiffs cannot show actual reliance, their common law

claim fails. Further, they have failed to identify an applicable theory to justify presuming reliance so their 1934 Securities Act claim fails.

## C. Dealing With The Class.

■ Ordinarily, I would enter summary judgment at this point. This is a class action, though, so there is one more issue to consider. These named plaintiffs cannot demonstrate reliance, but there may be other class members who can. As a result, the plaintiffs' reliance problem only precludes them from being typical plaintiffs under Fed.R.Civ.P. 23. *See In Re Bexar County Health Facility Development Corporation Securities Litigation*, 125 F.R.D. 625, 631 (E.D.Pa.1989). The reliance problem does not necessarily require dismissal.

While *Stinson* and *Bexar* were dismissed notwithstanding similar class problems, there is authority for letting a class proceed without named plaintiffs. *See East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 1898, 52 L.Ed.2d 453 (1977).

In this case, the complaint alleges there are over 1,000 class members in the United States. Based on this assertion, it is appropriate to give the class attorneys a chance to find acceptable named plaintiffs. I will grant forty five days to complete this process. At the end of this period, if there is no named plaintiff, I will decertify the class and dismiss the action.

## III. CONCLUSION

Because they cannot satisfy the reliance element of their claim, I find the named plaintiffs in this action unable to adequately represent the class. I will sever these plaintiffs from the class pursuant to Fed.R.Civ.Pro. 23. I will also enter summary judgement for the defendant against these plaintiffs. Finally, I will allow the class' attorneys forty five days to find a suitable named plaintiff to represent the class.